## AFFIDAVIT OF SPECIAL AGENT TIMOTHY R. KENNY

I, Special Agent Timothy R. Kenny, being sworn, depose and state as follows in support of my application for a complaint charging Jason VALLIERE, Orrin GUIDRY, Unknown Subject 1 ("UNSUB-1"), and Unknown Subject 2 ("UNSUB-2") with Conspiring to Distribute Controlled Substances, including cocaine, in violation of 21 U.S.C. § 846 (the "Target Offense"):

## I.    INTRODUCTION

1.    I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.   I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2014.   For much of that time, I have been engaged in gang and drug investigations.   I am currently assigned to the FBI's Boston Office.   Based on my training and experience as a Special Agent, I am familiar with federal narcotics, firearm, and money laundering laws.   In this regard, I know that it is a violation of 21 U.S.C. §§ 841(a)(1) and 846 to possess with intent to distribute, distribute, and/or to conspire to possess with intent to distribute or distribute controlled substances, including cocaine.

2.    Since becoming a Special Agent with the FBI, I have participated in investigations of narcotics trafficking and money laundering, and among other things, have conducted or participated in physical surveillance, the execution of search warrants, debriefings of subjects, witnesses, and informants, and participated in consensually recorded conversations and meetings. Through my training, education, and experience, I am familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

3.     I have written and/or participated in the execution of numerous search warrants resulting in the seizures of large quantities of controlled substances, packing implements, other paraphernalia involved in the manufacture and distribution of controlled substances, large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances.   I have participated in the debriefing of defendants, informants, and witnesses who had personal knowledge regarding large-scale drug trafficking organizations.   I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, and conducting arrests. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification, investigation, and enforcement.

4.     Based upon my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, state, national, and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection of monies that constitute the proceeds of narcotics trafficking activities.   I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.   I am also aware that narcotics traffickers speak in vague, guarded, or coded language when discussing their illegal activities, use text messages in lieu of phone calls to avoid speaking over the telephone, and employ a variety of counter-surveillance techniques to detect if their vehicles are being followed by law enforcement.

5.     The facts in this Affidavit have come from my personal observations, my training

and experience, my review of reports prepared by other agents, and information obtained from a variety of other sources, including other law enforcement officers and agents, task force officers, state and local law enforcement officers, public records, and consensually recorded telephone calls, text messages, and meetings.   The word "agent" or "investigator" is used in this Affidavit for all federal, state, and local law enforcement officers.   This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of arrest warrants charging Jason VALLIERE, Orrin GUIDRY, Unknown Subject 1 ("UNSUB-1"), and Unknown Subject 2 ("UNSUB-2") ("Target Subjects") with conspiring to distribute controlled substances, including cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

6.      Since this affidavit is submitted for the limited purpose of securing the requested arrest warrants, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the requested arrest warrants.   All times set forth herein are approximate.   Additionally, all text or WhatsApp communications have been reproduced in their original form.   References to quoted, recorded language reflect a preliminary transcript of those recordings.

## II.      FACTUAL BACKGROUND OF VALLIERE DTO

7.      I have participated in the investigation into Jason VALLIERE and his drug trafficking organization ("DTO") (the "VALLIERE DTO") since Spring 2020.   To date, the investigation has revealed that VALLIERE is a leader of the targeted conspiracy and has negotiated the purchase of a multi-kilogram quantity of cocaine from Undercover Employees ("UCs").   Specifically, VALLIERE has met with UCs on multiple occasions and detailed his plan for purchase and re-distribution of kilogram quantities of cocaine.   Further, VALLIERE has agreed to assist with the

cocaine's transportation by providing several individuals – GUIDRY, UNSUB-1, and UNSUB-2 (as well as Unknown Subject 3 ("UNSUB-3")) – who are willing to serve as guards during the drugs' transfer and delivery.   VALLIERE also negotiated compensation for those individuals.

### A.  Jason VALLIERE

8.      VALLIERE is a 42-year-old male whose criminal history includes convictions for armed robbery (2011), assault and battery (2011), possession of a firearm (2011), possession of a loaded firearm (2011), resisting arrest (2008, 2011), disorderly conduct (2008), possession of a class D controlled substance (2007), possession to distribute a class B controlled substance (2007), possession of a class B controlled substance (2007), knowingly receiving stolen property (1999), and operating a motor vehicle to endanger (1996).   Based on information obtained during this investigation, I believe that VALLIERE is an Elm Street Piru Blood gang member.



### B. Orrin GUIDRY

9.      Orrin GUIDRY is a 25-year-old male whose criminal history consists of various arrests, including threatening to commit a crime (2019), assault and battery on a family/household member (2019), breaking and entering in the nighttime (2019), destruction of property (2019), intimidation (2019), assault and battery (2019), and possession to distribute a class D controlled substance (marijuana) (2018).   GUIDRY is currently on Massachusetts state probation for threatening to commit a crime and assault and battery on a family/household member.   GUIDRY's criminal history also shows that he has been a defendant on five prior civil restraining orders involving four different women.



### C. Unknown Subject 1 ("UNSUB-1")

10.      Unknown Subject 1 ("UNSUB-1") is a medium complexion male, approximately 28-40 years old.   UNSUB-1 is approximately 5'7" tall and has a medium build.   On October 5, 2020, UNSUB-1 appeared with a black beard and balding hair.   Investigators are in the process of identifying UNSUB-1.



*UNSUB-1 on October 5, 2020*



*UNSUB-1 on September 11, 2020*

### D.  Unknown Subject 2 ("UNSUB-2")

11.      Unknown Subject 2 ("UNSUB-2") is a medium complexion male, approximately 18-25 years old.   UNSUB-2 is approximately 6'0" tall with a slender build.   On October 5, 2020, UNSUB-2 had short dark hair and a slight mustache.   Investigators are in the process of identifying UNSUB-2.



*UNSUB-2 on October 5, 2020*                                    *UNSUB-2 on September 11, 2020*

### III.     RECORDED UC MEETINGS WITH VALLIERE, GUIDRY, UNSUB-1, UNSUB-2, UNSUB-3 ▮▮▮▮▮▮

12.     Between July 2020 and October 2020, UCs conducted approximately seven recorded meetings with VALLIERE and/or VALLIERE and his co-conspirators and other associates.   Over the course of the meetings, VALLIERE, on behalf of other buyers, negotiated the purchase of ten kilograms of cocaine from the UCs and agreed to provide guards (including GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3) to protect that cocaine shipment during the unloading, transfer, and/or delivery process for VALLIERE and his associates' subsequent purchase.   Through various investigative steps, including toll record analysis, corroborating surveillance, and a review of cellular communications with UCs (the nature of which were consistent with, and corroborated subjects discussed at, undercover meetings in which VALLIERE participated) law enforcement identified VALLIERE's cellphone as 508-315-7366.   Additionally, T-Mobile subscriber records for that same phone number identify VALLIERE as the phone's subscriber.

13.     Investigators conducted surveillance of the meetings and took photographs and/or video of the meetings when possible.   Before each meeting, law enforcement provided activated audio and video recording devices to the UCs, which the UCs were then equipped with during the meetings. After the meetings, investigators collected and deactivated the recording devices from the UCs and debriefed the UCs about the meeting.   When applicable, investigators provided UCs with Official Agency Funds ("OAF") to be used during the meetings.





**B. September 10, 2020 Meeting: UC-2 and VALLIERE**

21.     On September 10, 2020, at 1:00 p.m., during an audio and video-recorded meeting, UC-2 met with VALLIERE in the area of 100 Northern Avenue, Boston, Massachusetts.   During the meeting, UC-2 told VALLIERE that the UCs could lower the price per kilogram of drugs to $39,000 per kilogram.   VALLIERE asked if that was their best offer noting that he wanted the deal "to be a go" and that "38 would be better," referring to a price of $38,000 per kilogram.

22.     UC-2 told VALLIERE that the truck with the kilograms of cocaine was on its way and asked if VALLIERE's associates would be ready to go whenever the shipment arrived and the deal happened.   VALLIERE responded, "everybody is ready to go… they keep hitting me up asking, when are we gonna do this."   UC-2 and VALLIERE then discussed the importance of VALLIERE's associates being armed so as to best protect the drugs.   In particular, VALLIERE told UC-2 that he had his "shit ready to go" and he "got something quiet on it, too."   Based on my training and experience, as well as the context of the communication, I believe that VALLIERE was referring to having a firearm ("shit") with a silencer ("something quiet on it") affixed to it.

23.     UC-2 then asked VALLIERE if he could provide UC-2 with an ounce (i.e., 28 grams) of cocaine the next day so that UC-2 could entertain guests over the weekend.   VALLIERE responded that he would try to obtain the cocaine and would let UC-2 know about pricing.

24.     At the end of the meeting, VALLIERE agreed to share the new proposed price for the kilogram-quantity cocaine deal - $39,000 ▮▮▮▮▮▮.   UC-2 and VALLIERE agreed to meet the next day (September 11, 2020) so that UC-2 could meet VALLIERE's associates who would be assisting in protecting the drugs during the anticipated deal.   UC-2 and VALLIERE also agreed that VALLIERE could provide the 28 grams of cocaine during that next-day meeting.

### C.  September 11, 2020 Meeting: UC-2, VALLIERE, GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3

25.     On September 11, 2020, at 1:25 p.m., UC-2 met with VALLIERE, GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 in the area of 100 Northern Avenue, Boston, Massachusetts.[2,3] The meeting was audio and video recorded. VALLIERE introduced UC-2 to GUIDRY, UNSUB-1,

---

2 Before the meeting, investigators provided UC-2 with OAF to purchase the cocaine.
3 Another UC also was present during this meeting but did not substantively participate in it.

UNSUB-2, and UNSUB-3.   The UNSUBs introduced themselves as "Orrin," "Joe," "Meek," and "Cal."   From my work on this investigation, I know that GUIDRY's first name is Orrin.

26.     As GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 stood in the background, VALLIERE told UC-2 ███████████ had agreed to the new price for the kilograms of cocaine ████████

████████████████████████████████████████████████████████████████

████████████████████████

27.     VALLIERE next told UC-2 that he could only obtain 14 grams of cocaine for UC-2 because he did not have enough money to purchase the requested 28 grams.   As GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 stood nearby, VALLIERE handed UC-2 a tied, clear, plastic bag containing a white powdery substance, consistent with cocaine, while stating it is "14" (i.e., 14 grams).   UC-2 asked VALLIERE how much he owed for the 14 grams of cocaine. VALLIERE replied, "8," which I know from training and experience to mean $800.   Later, UC-2 and VALLIERE entered UC-2's vehicle.   UC-2 handed VALLIERE $900 in OAF. VALLIERE counted the money and returned $100 of OAF to UC-2.

28.     As they sat in the car, VALLIERE told UC-2 that he had told ████████ the price would be $38,000 (not $39,000) per kilogram.   UC-2 laughed at the change in price, commenting that VALLIERE was a business man. ███████████████████████████████████████████

███████████████████████ UC-2 asked if GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 were "Bloods," given that several of them were wearing red (which I know from my training and experience to be a gang color associated with the Bloods).   VALLIERE (referring to GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3) told UC-2 that "a few of them" were Bloods gang members.   VALLIERE assured UC-2 that they were "shooters" and would "squeeze the trigger."

Based on my training and experience in conducting gang investigations, I believe that VALLIERE meant that GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 were experienced with firearms and would shoot firearms if necessary.

29.     At the end of the meeting, investigators photographed VALLIERE, GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 leaving the area.   As they walked away, investigators captured VALLIERE distributing cash out to GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3.



*VALLIERE, GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 leave September 11, 2020 meeting*



*VALLIERE distributing cash to GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 on September 11, 2020*

30.      UC-2 then left and met with case personnel.   UC-2 gave investigators the tied, clear plastic bag, which contained additional clear plastic bags with a white powdery substance, consistent in appearance with cocaine.   Investigators weighed the tied, clear plastic bag containing the suspected cocaine, which weighed approximately 15.8 grams.   Investigators field-tested the suspected cocaine using a TruNarc Raman Spectrometer, which tested positive for the presumptive presence of cocaine hydrochloride.   Investigators processed the evidence and entered it into the FBI-Boston Evidence Control Room for further testing.

D.   **September 22, 2020 and September 23, 2020: WhatsApp Communications Between UC-2 and VALLIERE**

31.      On September 22, 2020, at 1:31 p.m., UC-2 sent a WhatsApp message to VALLIERE stating, "Sup man, the next truck is coming East. I have your 10 tires ready with 38 rims for next week. Are you ████████ ready??"   At 9:04 p.m., VALLIERE responded, "I have to speak with

█████ ."  I know, based on my training, experience, and involvement in this investigation, that UC-2's reference to "10 tires" and "38 rims" was to ten kilograms of cocaine arriving on a truck the following week for VALLIERE █████ at a price of $38,000 per kilogram.



33.    UC-2 responded, "We can work something out before the truck arrives next week"; "U █████ █████ be ready to meet me on Tuesday for final details so we can get rolling."   VALLIERE responded, "Ill get it done."

**E.  September 29, 2020 Meeting: UC-2 and VALLIERE**

34.    On September 29, 2020, UC-2 met with VALLIERE in a Lowe's Home Improvement parking lot at 1360 S. Washington Street, North Attleboro, Massachusetts.[4]   At 2:25 p.m., VALLIERE arrived in the parking lot and entered UC-2's vehicle.

35.    ████████████████████

---

[4] Another UC also was present during this meeting but did not substantively participate in the conversation.



36.    UC-2 explained to VALLIERE that a shipment was on the way and that ten kilograms in

the shipment were designated for ▮▮▮▮▮ VALLIERE. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮. UC-2 then asked VALLIERE if he could "find other dudes for the ten" ▮

▮▮▮▮▮▮. VALLIERE said he would try and reiterated that

distribution of the drugs was not the issue, but rather, providing the money upfront. ▮▮▮▮

▮▮▮▮▮▮▮

VALLIERE said that he had a lot of people willing to buy "work" (i.e., cocaine), ▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮

37.    VALLIERE reassured UC-2 that he had stopped working so he could do "this" full time,

which I believe to be a reference to the purchase, distribution, and/or protection of cocaine

shipments.  UC-2 said that he did not expect VALLIERE to quit his job.  VALLIERE noted he

was not blaming UC-2 for quitting his job and that it was a decision he had made for himself because he could not "network and be out there and set everything up while I'm going to work." UC-2 said that VALLIERE's time was valuable and gave him $1,000 in OAF.

38.     VALLIERE then asked UC-2 about his associates who had been willing to act as guards during any transfer of cocaine during the deal stating, "What about this, I got all these guys coming up here, getting ready to do security, I had to round them guys up, tell them I had an opportunity for them… I don't wanna look like a liar either."   VALLIERE also told UC-2 that he paid his associates money UC-2 previously had provided to him stating, "I paid them that money you gave me that day… I gave it to them… and I took them out to eat."[5]   UC-2 asked, "Are those cats alright?"   VALLIERE responded, "Yeah, they're ready to go."   UC-2 said, "Well how about this, that other truck that was coming, ████████████████ that shit needs protection, right? Like I said man, I don't know the day, but it's coming soon.   You and the boys ready for that?" VALLIERE responded, "Yeah."   I believe, based on my training, experience, and involvement in this investigation, that VALLIERE was confirming GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3's availability and willingness to assist in protecting the transfer of cocaine during the deal.

### F.  September 29, 2020 and September 30, 2020 WhatsApp Messages: UC-2 and VALLIERE

39.     On September 29, 2020, at 4:11 p.m. (roughly an hour after the prior September 29 meeting with VALLIERE ended) VALLIERE sent WhatsApp messages to UC-2.   VALLIERE wrote, "Just talked to my boy said he will take 4 tires but he'd have to show his people the product…

---

[5] From my work on this investigation, I know that UC-2 paid VALLIERE $800 during the cocaine sale on September 11, 2020, and that surveillance observed VALLIERE handing cash to GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3 after the September 11, 2020 meeting ended.

everyones skeptical of the quality…" and "But im workn on it."   I believe, based on my training, experience, and involvement in this investigation, that VALLIERE informed UC-2 that he had found someone to buy four of the ten kilograms of cocaine.

40.     On September 30, 2020, at 8:41 a.m., VALLIERE messaged UC-2, "Got another person wants 5" and "Cash."   UC-2 responded, "K" and "Call you in about an hour."   I believe, based on my training and experience, that VALLIERE was informing UC-2 that he had found another buyer for five kilograms of cocaine from the incoming shipment and that the buyer had cash on hand for the sale.[6]

### G.  September 30, 2020: UC-2 Phone Call with VALLIERE

41.     On September 30, 2020, at 10:44 a.m., UC-2 called VALLIERE over WhatsApp at telephone number 508-315-7366.   The call was recorded.   UC-2 asked, "You spoke to your boys?," referring to the two buyers whom VALLIERE had referenced in his September 29 WhatsApp communications.   VALLIERE confirmed that he had and that both of the buyers were ready to complete the transaction.   Based on my training, experience, and work on this investigation, I believe that VALLIERE was referring to two different individuals who had committed to buying different quantities of kilograms from the ten-kilogram cocaine shipment. VALLIERE confirmed that both buyers knew the price per kilogram of cocaine would be $38,000.

### H.  September 30, 2020 WhatsApp Messages: UC-2 and VALLIERE

42.     On September 30, 2020, at 12:48 p.m., VALLIERE sent a WhatsApp message to UC-2 stating, "The guy that wants 5 is definite hes ready, working on the other."   I believe, based on training, experience, and my involvement in this investigation, that VALLIERE meant that the

buyer interested in purchasing five kilograms of cocaine was ready to complete the deal and that

VALLIERE was continuing to negotiate with the other buyer.

43.     At 12:54 p.m., UC-2 responded, "Aight cool" and "Spoke to them they said truck will be

arriving sometime mid to late next week."   VALLIERE texted, "Dam."   UC-2 then wrote,

"Package tires are good and confirmed"; "We need to get together a couple days before bro to set

shit up"; and "Have the the four boys ready."   At 1:25 p.m., VALLIERE responded, "Ok."   Based

on my training, experience, and work on this case, I believe that UC-2 told VALLIERE that the

drug shipment ("truck") would be arriving mid to late next week and that the ten kilograms of

cocaine were included in the shipment ("Package tires are good and confirmed").   I also believe

UC-2's reference to "the four boys" was to GUIDRY, UNSUB-1, UNSUB-2, and UNSUB-3,

VALLIERE's designated guards for assisting in the cocaine transfer during the deal.

### I.   October 5, 2020 Meeting: UC-2, VALLIERE, GUIDRY, UNSUB-1, and UNSUB-2

44.     On October 5, 2020, UC-2 met with VALLIERE, GUIDRY, UNSUB-1, and UNSUB-2

during a recorded meeting.   Two additional UCs also were present during the meeting.   UC-2

asked VALLIERE to speak with him in UC-2's vehicle out of GUIDRY, UNSUB-1, and UNSUB-

2's presence.   GUIDRY, UNSUB-1, and UNSUB-2 remained standing immediately outside of

the vehicle as UC-2 and VALLIERE entered the vehicle's backseat.   UC-2 asked VALLIERE if

he had spoken to his buyers.   VALLIERE said he had not.   UC-2 asked VALLIERE if he could

call them right there and then.   VALLIERE left the vehicle to retrieve his phone and then re-

entered the car.   The UC-2 observed VALLIERE sending what appeared to be text messages on

his phone and heard sounds consistent with texting.   Moments later, VALLIERE told UC-2 that

one of the buyers had confirmed they were ready to complete the deal.   VALLIERE further

19

explained, "So I got two other guys that help me get all the buyers together…

…I got my other guy, he got, he got his boy to buy five, right."[7]   Based on my

training, experience, and involvement in this investigation, I believe that VALLIERE was

explaining how he had lined up one of the buyers to purchase five of the ten kilograms scheduled

for delivery. VALLIERE further stated,

45.    VALLIERE continued discussing the anticipated cocaine shipment deal with UC-2.

46.     UC-2 confirmed for VALLIERE that the buyers would have cash (i.e., $380,000) for the ten kilograms on hand when the cocaine arrived.   UC-2 asked, "But I just wanna, you know, I wanna make sure everything is good between us and the buyers ya know. They, they, they, they will have cash on hand?"   VALLIERE confirmed, "Of course."   UC-2 stressed, "I'm not cuffin anything, right?"   Based on my experience in drug investigations, I know that the term, "cuffing," means providing drugs upfront before any payment has been received.   VALLIERE responded, "Yes, bro, we got it… trust me. I want my money, too, so… I can't get none…I'm not… I wouldn't cuff these people."

47.     As they finished discussing the anticipated drug deal, VALLIERE suggested having a money counter present to expedite the transaction.   VALLIERE asked, "Yo, oh, one more thing umm… should I bring a money counter?"   UC-2 said, "Money counter…do you have one?" VALLIERE responded, "Yeah. ████████████████████████████… It'll make things faster."

48.     UC-2 and VALLIERE then exited the vehicle, and UC-2 addressed GUIDRY, UNSUB-1, and UNSUB-2, who were still standing outside the car.   UC-2 clarified the nature of the anticipated deal in which they would be participating stating, "I gotta make sure you guys understand that we're not moving furniture, we're not moving fuckin' fruits, vegetables, and all that.   We're movin' fuckin' dope and a lot of it… right… a lot of fuckin' kilos."   At the same

time as the recording device was capturing UC-2's statements, investigators surveilling in the area captured surveillance video of the meeting.  At this juncture in the conversation, investigators observed (and the surveillance video captured) UNSUB-2 nodding in affirmation of UC-2's statements.

49.    UC-2 next stated, "I gotta make sure you guys are good. If you're not good, you can go home, man, and I can find someone else, but I just gotta make sure you guys are good, ok?"   At this part in the conversation, investigators observed (and the surveillance video captured) UNSUB-1 nodding his head in affirmation.   Based on the audio captured on UC-2's recording device and the images from the surveillance footage, it appears that UNSUB-1 also said, "we're cool with it, brother."   UC-2 continued, "You know Jay's [VALLIERE] going to handle everything with you guys, but I need two hours' notice. When I get the fuckin phone call, Jay's [VALLIERE] gonna get the phone call… I don't know what time it is exactly, but once that time is up, we gotta be ready to go."   Throughout UC-2's advisement, GUIDRY, UNSUB-1, and UNSUB-2 continued standing in place listening to UC-2.

50.    UC-2 then directed one of the UCs to pass out bright yellow t-shirts to GUIDRY, UNSUB-1, and UNSUB-2 (each of whom accepted his t-shirt) instructing them to wear the t-shirts during the anticipated arrival and transfer of drugs to VALLIERE.   UC-2 had one of the UCs provide an extra t-shirt to UNSUB-1 so that UNSUB-1 could provide the t-shirt to UNSUB-3 (who was not present at the meeting).   UNSUB-1 accepted the t-shirt, tossing it over his shoulder.



51.     UC-2 then stated to GUIDRY, UNSUB-1, and UNSUB-2, "I'm giving you guys a little advance…for...so you guys can spend, have some spending money before we get the ball rolling." UC-2 then directed one of the UCs to hand GUIDRY, UNSUB-1, and UNSUB-2 each $500 in OAF funds.   GUIDRY, UNSUB-1, and UNSUB-2 each accepted the cash.   UNSUB-1, UNSUB-2, and GUIDRY also began counting the money in UC-2's presence before all three ultimately placed the cash into their respective pockets.   UC-2 then addressed VALLIERE stating, "Yo Jay, so I gave your guys $500 each in advance, and you… $1,000.   I can't give the other dude (UNSUB-3) $500 until I see him ok… When he shows up, we'll give him $500, and we'll pay the rest what we discussed."



52.     UC-2 then said, "You good to go?"   VALLIERE responded, "Yeah, yeah."   UC-2 turned

to GUIDRY, UNSUB-1, and UNSUB-2 stating, "I'll hit you up. Two hours, boys, be ready, ok."

One of the three responded, "We'll be ready baby."   Surveillance then observed UC-2,

VALLIERE, GUIDRY, UNSUB-1, and UNSUB-2 shake hands.   VALLIERE, GUIDRY,

UNSUB-1, and UNSUB-2 entered VALLIERE's vehicle and left the area.

### J.   October 7, 2020 WhatsApp Messages: UC-2 and VALLIERE

53.     On October 7, 2020, at 10:02 a.m., UC-2 sent a WhatsApp message to VALLIERE stating,

"Just got word and its def a go early Friday morning."   VALLIERE responded, "Ok perfect." UC-

2 added, "It's time to make some dough" and asked if VALLIERE's buyers had contacted him.

VALLIERE responded, "1 of them said we good waiting on the other."   UC-2 sought to clarify

how the ten kilograms of cocaine were to be distributed, asking VALLIERE, "So 4 will go to one

dude and 5 will go to another dude correct?," noting that there would be one kilogram still leftover

of the total delivery amount.   VALLIERE responded that "ill keep 1 if it comes to that but im double checking."   Based on my training, experience, and work on this case, I believe that VALLIERE indicated he was finalizing the kilogram distribution quantities with his buyers, and that if he could only distribute five kilograms to one and four to another, he would be willing to keep the final kilogram himself.

54.      At 11:49 a.m., VALLIERE asked UC-2, "Its C not D right?   When we last spoke you told the boys D I am confused."   Based on my training, experience, and work on this investigation, I know that the term, "dope" – which UC-2 used when confirming details with UNSUB-1, UNSUB-2, and GUIDRY during the October 5, 2020 meeting – is a drug term for fentanyl or heroin in the New England area.   VALLIERE's message about UC-2 having "told the boys D" is a reference to UC-2's October 5, 2020 statements to UNSUB-1, UNSUB-2, and GUIDRY that, "***We're movin' fuckin' dope*** and a lot of it… right… a lot of fuckin' kilos."   Based on my training, experience, and knowledge of this case, I believe that VALLIERE sought to confirm that the anticipated deal would be for kilograms of cocaine, not fentanyl/heroin ("Its C not D right?").   UC-2 responded, "yeah bro it's coke I misspoke," to which VALLIERE answered, "Bet."

55.      At 1:41 p.m., VALLIERE sent a WhatsApp message to UC-2 stating that he had "found a hammer n nails ill grab it…you wanna take it off my hands when I get it?" and described the hammer as "22."   Based on my training, experience, and knowledge of this investigation, I recognize "hammer n nails" as coded language for a loaded firearm and "22" as coded language for a 22 caliber firearm.   VALLIERE indicated that he would bring the firearm with him during the anticipated deal after which UC-2 could take possession of it.

### K.  **Anticipated Meeting: VALLIERE, GUIDRY, UNSUB-1, and UNSUB-2 (most likely UNSUB-3)**[8]

56.     Based on the prior meetings and text communications, I believe that VALLIERE, GUIDRY, UNSUB-1, and UNSUB-2 (and most likely UNSUB-3) will appear at a predetermined time, date, and location in the District of Massachusetts to participate in an anticipated drug deal which they believe involves multi-kilogram quantities of cocaine and for which VALLIERE and his associates have agreed to provide $380,000 cash and the physical support of GUIDRY, UNSUB-1, and UNSUB-2 (as well as UNSUB-3).

## III.    CONCLUSION

57.     Based on all of the foregoing, there is probable cause to believe that Jason VALLIERE, Orrin GUIDRY, UNSUB-1, and UNSUB-2 have conspired to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.


Sworn to under the pains and penalties of perjury.

TIMOTHY R. KENNY
Special Agent
Federal Bureau of Investigation

Signed electronically and sworn to by teleconference on October 8th, 2020,

HON. MARIANNE B. BOWLER
United States Magistrate Judge

---

8 On October 8, 2020, VALLIERE requested a photograph from UC-2 (that UC-2 previously had shown to VALLIERE during an undercover meeting), which showed kilogram quantities of drugs.   UC-2 texted the image – i.e., the prior photograph showing kilogram quantities of drugs – to VALLIERE.   VALLIERE responded questioning UC-2 about the photograph being taken from the Internet.